UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


SARASOTA COUNTY
PUBLIC HOSPITAL BOARD,

     Plaintiff,

v.                               CASE NO. 8:18-cv-2873-T-23SPF

BLUE CROSS AND BLUE SHIELD
OF FLORIDA, INC., et al.,

     Defendant.
_____/


## ORDER

A June 21, 2019 order (1) determines that ERISA completely preempts this action, (2) denies the motion to remand, and (3) dismisses the complaint. An April 7, 2020 order dismisses the amended complaint.  Although the plaintiff again amends (Doc. 64) the complaint, the defendants again move (Doc. 68) to dismiss because "a discernable number of federally-governed plans continue to pervade Plaintiff's causes of action, which thus remain preempted."  (Doc. 68 at 4) Resolution of the motion requires another slog through the law of Employee Retirement Income and Security Act, 29 U.S.C. § 1001 (ERISA); the Federal Employee Health Benefits Act, 5 U.S.C §§ 8901–14 (FEHBA); and the Social Security Act, 42 U.S.C. § 1395 (Medicare).

**BACKGROUND**

As recounted in both the June 21, 2019 order and the April 7, 2020 order, the defendants administer health insurance and some of the defendants' insureds are enrolled in health benefit plans regulated by ERISA, FEHBA, or Medicare. The plaintiff entered into a "Preferred Patient Care Hospital Agreement" (PPC Agreement) with one defendant, Florida Blue, and a "Hospital Services Agreement" (HO Agreement) with the other defendant, Health Options. These "Provider Agreements," which the parties frequently renew and amend, establish both the terms under which the plaintiff provides "hospital services" to the defendants' members and the terms under which the defendants pay for those services. The plaintiff alleges, among other things, that the defendants breached the Provider Agreements by using improper methods of payment.

Count I asserts that Florida Blue improperly paid for hospital services provided to Blue Select Members by, for example, implementing a "split-billing" policy that allegedly violates the PPC Agreement. Count II alternatively alleges that if the Blue Select plan "is not payable under the PPC Agreement," the defendants violated Section 641.513, Florida Statutes, and Section 627.64194, Florida Statutes. In Counts III and IV, the plaintiff alleges that the defendants breached the "anti-steerage" provisions of the Provider Agreements by "advising, steering, and providing incentives to [plan] members to seek hospital services from other hospital

- 2 -

providers" and by excluding from the defendants' directories "certain of Hospital's facilities." (Doc. 64 at 23–4)

Counts IV and V allege that the defendants breached the Provider Agreements by underpaying the contractually required amount to the plaintiff either for services provided after the receipt of an authorization or for services provided when no authorization was required. Counts VII and VIII assert that the defendants breached the Provider Agreements by employing third parties to deny claims for payment.[1] In Count IX, the plaintiff alleges that Florida Blue breached the PPC Agreement by underpaying for hospital services provided to Medicare Advantage Blue Card members. And finally, Counts X and XI allege that the defendants underpaid for emergency services by failing to apply the "prudent layperson standard" and by "retrospectively denying payment of the contractually required amount . . . for reasons not permitted by the P[rovider] Agreement[s]." (Doc. 64 at 47)

## DISCUSSION

In each count (except Count II, alleging a violation of Florida statutory law), the plaintiff alleges a breach of at least one of the Provider Agreements, and the plaintiff insists that the defendants' underpayments are "not due to benefit plan determinations." (Doc. 64 at 43) Further, the plaintiff includes examples of the alleged breaches and appends to the amended complaint several exhibits intended

_____

[1] "Payment claims" comprise the claims the plaintiff submitted to the defendants for reimbursement and the defendants' determinations. *See, e.g.*, Docs. 1-14–1-33. A "payment claim" by definition is distinct from a "claim" (that is, a claim for relief) alleged in a complaint.

to corroborate the alleged underpayments.  The defendants posit four reasons for dismissal, and the plaintiff responds to each.  The parties re-visit whether the plaintiff satisfies Rule 8, Federal Rules of Civil Procedure; whether federal law preempts the plaintiff's breach of contract claims; and whether the plaintiff states a claim under Florida statutory law.

### I. Whether the second amended complaint satisfies Rule 8

First, the defendants contend that the second amended complaint, like the first amended complaint, fails to satisfy Rule 8.  (Doc. 68 at 9–14)  To this end, the defendants argue that the second amended complaint constitutes a "shotgun pleading" (1) because the complaint includes "conclusory allegations" and (2) because the plaintiff combines two or more claims in the same count.  (Doc. 68 at 10–11, 14)  Further, the defendants challenge the plaintiff's use of exhibits (such as the attached claims for payment) because the exhibits fail to "provide adequate data points to allow Defendants or the Court to test the nature of the claims at issue to determine [ ] which are federally-preempted and which are not."  (Doc. 68 at 12)

In response to the defendants' Rule 8 challenges, the plaintiff notes the impracticability of listing in separate counts "thousands of breaches by" the defendants.  (Doc. 71 at 2)  "Each count contains one cause of action under the applicable Provider Agreement," explains the plaintiff, "and one claim for breach of specific provisions of the [ ] agreement, which is proven by multiple different

instances of breach." (Doc. 71 at 3) Accordingly, the plaintiff insists that the second amended complaint complies with Rule 8.

The second amended complaint pleads "enough [facts] to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The second amended complaint distills the prolix and repetitious amended complaint, and the second amended complaint is a noticeable improvement. The defendants cannot reasonably argue that the defendants lack "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555.

## II. Whether federal law preempts the plaintiff's state law claims

Next, the defendants argue that, despite the plaintiff's attempt to identify the claims at issue, the second amended complaint "continues to assert preempted claims and should be dismissed." (Doc. 68 at 16) In addition to re-visiting ERISA preemption, the defendants argue that the FEHBA and Medicare defensively preempt the plaintiff's claims. Also, the defendants argue that the plaintiff fails to allege administrative exhaustion required by the FEHBA and Medicare. (Doc. 68 at 16–22)

The plaintiff denies that the complaint alleges either "causes of action related to benefit determinations" or "causes of action [that] are [ ] governed or preempted by ERISA, FEHBA, or the Medicare Act." (Doc. 71 at 2) A resolution of the parties' preemption dispute depends on whether a claim that purports to derive solely

from a contract between a medical provider and an insurer "relates to" ERISA and, consequently, is preempted.

### A. ERISA Preemption

Regarding ERISA preemption, the defendants argue that the plaintiff "continues to assert preempted claims." In support, the defendants cite a payment claim from Count X. In the payment claim, Blue Cross denied coverage because the "benefit plan requires preauthorization of this service and [the] records show it was not received." (Doc. 68 at 15) The defendants argue that "as expressly stated in the denial reason, those coverage determinations were explicitly based on interpretations" of a plan governed by ERISA. (Doc. 68 at 15)

The plaintiff responds that "ERISA's express preemption provision does not defensively preempt the Hospital's independent state law causes of action in the Second Amended Complaint because none of the causes of action therein 'relate to' ERISA." (Doc. 71 at 5) In support, the plaintiff argues that determining whether the Blue Select plan constitutes a participating plan under the Provider Agreements "does not require the review or interpretation of an ERISA health benefit plan." (Doc. 71 at 8) And similarly, the plaintiff argues that the plaintiff's challenge to the defendants' "split-billing" policy "does not implicate an ERISA health benefit plan, [but] rather implicates and challenges obligations and duties set forth in the Provider Agreements." (Doc. 71 at 9)

Further disputing ERISA preemption, the plaintiff draws a temporal distinction between when the insurer determined coverage and when the insurer denied payment.  The plaintiff asserts that "the Provider Agreements, not ERISA, determine[ ] when the Parties agreed . . . coverage decisions must be made." (Doc. 71 at 11)  And because under the Provider Agreements a payment obligation attaches when the defendants determine coverage and provide authorization, the plaintiff contends that the defendants breached the Provider Agreements by refusing payment after the defendants determined coverage.  As the plaintiff explains, "once a Hospital Service was authorized, Defendants were contractually obligated to pay the contracted rates, and contractually prohibited from retroactively disputing their own coverage determination."  (Doc 71 at 12)

Next the plaintiff argues that the claims related to Medicare Advantage Blue Card members "do not implicate ERISA," and the plaintiff argues that the claims related to emergency services fail to implicate ERISA because emergency services require no pre-authorization under either Florida law or the Provider Agreements. (Doc. 71 at 13–5)  Finally, assuming one count warrants preemption, the plaintiff argues that "preemption of some counts does not require dismissal of non-ERISA related counts."  (Doc. 71 at 16)

Section 514(a) provides that ERISA "supersede[s] any and all State laws insofar as they . . . relate to any employee benefit plan" governed by ERISA.  A state law "'relate[s] to' a covered employee benefit plan for purposes of § 514(a) 'if it (1) has a

connection with or (2) reference to such a plan.'" *California Div. of Labor Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 324 (1997) (*quoting District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 129 (1992).  But not everything involving an employee benefit plan "relates to" ERISA.  *Rutledge v. Pharmaceutical Care Management Association*, 141 S. Ct. 474, 480 (2020) ("Crucially, not every state law that affects an ERISA plan or causes some disuniformity in plan administration has an impermissible connection with an ERISA plan.").  As explained by *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 n.21 (1983), "Some state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan."  Because the standard by which a state law is preempted "ha[s] been neither consistent nor clear," *Morstein v. Nat'l Ins. Servs., Inc.*, 93 F.3d 715, 718 (11th Cir. 1996), determining the scope of "ERISA's express preemption provision is a nettlesome task."  *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 225 (3d Cir. 2020); *see also See Rutledge*, 141 S. Ct. at 485 (Thomas, J., concurring) (discussing how the standards in ERISA jurisprudence "have . . . yielded more confusion").

Given the "limited utility" of the statute and standard in identifying the exact bounds of preemption, *Jones v. LMR Int'l, Inc.*, 457 F.3d 1174, 1179 (11th Cir. 2006), the Supreme Court has announced that to determine a state law's "connection with" ERISA, a district court "look[s] both to 'the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive,' as well

as to the nature of the effect of the state law on ERISA plans." *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 147 (2001); *see also Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 137 (1990) (holding that "[t]he purpose of Congress is the ultimate touchstone" in a preemption analysis) (*quoting Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 208 (1985)).

An examination of "the purpose of Congress" — a chimerical and amorphous quest, indeed — reveals to the Supreme Court that "ERISA was enacted 'to promote the interests of employees and their beneficiaries in employee benefit plans,' . . . and 'to protect contractually defined benefits.'" *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989) (internal citations omitted). Also, *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995), explains that ERISA aims "to ensure that plans and plan sponsors would be subject to a uniform body of benefits law. . . , to minimize the administrative and financial burden of complying with conflicting directives . . . , [and to prevent] the potential for conflict in substantive law."

In light of these purposes and the economic dynamics of the health care industry, several circuit courts of appeals, including the Eleventh Circuit, hold that  "state law claims brought by health care providers against plan insurers have too remote an effect on ERISA plans to be preempted by the Act." *Boca Raton Community. Hosp., Inc. v. Great-W. Healthcare of Fla.*, 2008 WL 728538, at *6 (S.D. Fla. 2008) (*citing Lordmann Enterprises, Inc. v. Equicor, Inc.*, 332 F.3d 1529 (11th Cir.

1994)).  As *Lordmann Enterprises, Inc. v. Equicor, Inc.*, 332 F.3d 1529, 1533–34 (11th

Cir. 1994), finds:

> preemption of third-party provider claims does not serve
> Congress's purpose for ERISA. Congress enacted ERISA to
> protect the interests of employees and beneficiaries covered by
> benefit plans. Preemption in a third-party health care provider
> case would defeat rather than promote this goal. The
> 'commercial realities' of the health care industry require that
> health care providers be able to rely on insurers' representations
> as to coverage. . . . [T]he employees whom Congress sought to
> protect would find medical treatment more difficult to obtain.

Further, "a health care provider's claim against [an insurer] under the plan affects the

relationship between the principal ERISA entities at best only indirectly."[2]

*Lordmann*, 32 F.3d at 1533.

In addition to the effect of preemption on employees and beneficiaries (both

of whom are "principal ERISA entities"), preemption of third-party provider claims

adversely affects providers in the healthcare industry.  Providers "were not parties to

the 'ERISA bargain,'" that is, providers are not the employers or employees who

exchanged state law causes of action for a uniform system of employee benefits

and "federal causes of action under ERISA."  *Surgery Center of Viera*, 465 F. Supp. 3d

---

[2] In conducting a preemption analysis, several circuit courts of appeals place weight on
how a state law claim affects "principal ERISA entities." For example, in the Fifth Circuit, "[a]
defendant pleading preemption under [Section 514] must prove that '(1) the state law claims address
an area of exclusive federal concern, such as the right to receive benefits under the terms of an
ERISA plan; and (2) the claims directly affect the relationships among traditional ERISA entities—
the employer, the plan and its fiduciaries, and the participants and beneficiaries.'" *Access Mediquip
L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 382 (5th Cir. 2011) (*quoting Mem'l Hosp. Sys. v.
Northbrook Life Ins. Co.*, 904 F.2d 236, 245 (5th Cir. 1990)), *aff'd en banc*, 698 F.3d 229 (2012). Even
within this framework, however, "[h]ealthcare providers such as physician assistants generally are
not considered 'beneficiaries' or 'participants' under ERISA." *Hobbs v. Blue Cross Blue Shield of
Alabama*, 276 F.3d 1236, 1241 (11th Cir. 2001).

at 1220. Thus, ERISA preemption of contracted provider claims leaves a provider without practical recourse, especially if the claims involve scores of payment denials and challenges to widespread payment policies. Therefore, ERISA seldom defensively preempts a contracted provider's state law claim against an insurer. *Transitional Hosps. Corp. v. Blue Cross & Blue Shield of Texas, Inc.*, 164 F.3d 952, 954 (5th Cir. 1999) ("ERISA does not [defensively] preempt state law when the state-law claim is brought by an independent, third-party health care provider (such as a hospital) against an insurer for its negligent misrepresentation regarding the existence of health care coverage.").

In a similar manner, defensive preemption might impede the "purpose of Congress" in this instance. Allowing the plaintiff's claim to survive "do[es] not 'interfere[ ] with nationally uniform plan administration." *Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 943 (2016) (*quoting Egelhoff*, 532 U.S. at 148). In fact, preemption "would undermine ERISA's stated purpose" and adversely affect plan participants and beneficiaries, both of whom might become subject to "up-front payments . . . or raise[d] fees." *Plastic Surgery Center*, 967 F.3d at 230 (*quoting Lordmann*, 32 F.3d at 1533). Further, because the plaintiff, a healthcare provider, was not a party to the presumed "ERISA exchange," ERISA bears only a loose connection to the claims asserted under the Provider Agreements. *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 249 (5th Cir. 1990) ("Simply put, Memorial Hospital and the countless other health care providers in this country were not a party to this

bargain."). The plaintiff's status as a contracted provider gravitates against a finding of defensive preemption. *Surgery Ctr. of Viera, LLC v. Cigna Health*, 2020 WL 4227428, at *5 (M.D. Fla. 2020) (stating that the plaintiff's "status as a medical provider — as opposed to a plan participant or beneficiary — does change the result. A medical provider's claims based on conduct independent of an ERISA plan . . . can be too tenuously connected to ERISA").

Also, although the plaintiff's claims exist because of plans governed by ERISA, the resolution of the parties' dispute depends on the construction of, and performance under, the Provider Agreements. *Pascack Valley Hosp. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 402 (3d Cir. 2004) (finding no preemption because the parties principally disputed the meaning of the Subscriber Agreement, not coverage and eligibility). According to the plaintiff, the Provider Agreements established a course of dealing under which a pre-authorization for hospital services constitutes a promise of payment. That promise bears little relevance to obligations under a benefit plan. *Pascack Valley Hosp.*, 388 F.3d at 402 (3d Cir. 2004) ("The Hospital's right to recovery, if it exists, depends entirely on the operation of third-party contracts executed by the Plan that are independent of the Plan itself.").

An examination of the plaintiff's second amended complaint demonstrates also that the extent of a plan's coverage for the plaintiff's services and the correctness of the defendants' coverage determinations are largely immaterial to adjudicating the

plaintiff's claims.  *See Hospice of Metro Denver, Inc. v. Grp. Health Ins. of Oklahoma, Inc.*, 944 F.2d 752, 754 (10th Cir. 1991) ("Blue Cross's denial of payment to [the provider] was a mere consequence of its denial of coverage . . . .  [The provider] does not claim any rights under the plan, and does not claim any breach of the plan contract. . . . [The insured's] right to receive benefits under the plan is not at issue.").  Evaluating the merits of the plaintiff's breach of contract claims requires considering (1) the plaintiff's reasonable expectations of reimbursement under the Provider Agreements and (2) whether the defendants' disposition of reimbursement claims conformed to those expectations.  But "a claim that 'turns largely on legal duties generated outside the ERISA context,' and 'requires only a cursory examination of the plan' is 'not the sort of exacting, tedious, or duplicative inquiry that the preemption doctrine is intended to bar.'"  *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 233 (3d Cir. 2020) (*quoting Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 85 (3d Cir. 2012)).

The defendants might correctly observe that some "coverage determinations were explicitly based on interpretations" of a federally governed plan (Doc. 68-1 at 5), but the "mere fact that a claim arises against the factual backdrop of an ERISA plan does not mean it makes 'reference to' that plan."  *Plastic Surgery Center*, 967 F.3d at 235.  Although some of the plaintiff's claims might fail to exist but for the interpretation of an ERISA plan, "the fact [that] an ERISA plan is an initial step in the causation chain, without more, is too remote of a relationship with the covered plan to support a finding of preemption."  *Morris B. Silver M.D., Inc. v. Int'l Longshore*

*& Warehouse etc.*, 2 Cal. App. 5th 793, 807 (2016).  The plaintiff expressly disavows asserting a claim under an assignment of benefits.  (Doc. 64 at 4) ("Hospital is not suing upon, or relying upon, any purported assignment of benefits provided by Defendants' members. . . .").  And the plaintiff "seeks damages, not wrongfully denied benefits."  *Franciscan Skemp Healthcare, Inc. v. Cent. States Joint Bd. Health & Welfare Tr. Fund*, 538 F.3d 594, 598 (7th Cir. 2008).  Thus, the plaintiff's claims are more aptly characterized as "a mere consequence of [the defendants'] denial of coverage," and the contractual nature of the relation between the plaintiff and the defendants commends denial of preemption.  *Med. Mut. of Ohio, v. Air Evac EMS, Inc.*, 341 F. Supp. 3d 771, 778 (N.D. Ohio 2018).

Finally, acceptance of the defendants' position would cause an absurd precedent for a healthcare provider attempting to assert claims based on breach of a provider agreement.  The plaintiff challenges thousands of payment claims.  Under the defendants' theory of preemption, an analysis of preemption requires tediously examining each individual payment claim to determine (1) the claim's relation to a benefit plan and (2) whether the plaintiff exhausted an administrative remedy for each claim.  But the plaintiff is "not challenging individual denials"; rather, the plaintiff is challenging the "review policy writ large."  *Am. Coll. of Emergency Physicians v. Blue Cross & Blue Shield of Georgia*, 2020 WL 6165852, at *2 (11th Cir. 2020); *see also Nat'l Renal All., LLC v. Blue Cross & Blue Shield of Georgia, Inc.*, 598 F. Supp. 2d 1344, 1356 (N.D. Ga. 2009) ("Plaintiffs challenge not a refusal to pay

claims related to a single patient.  Rather, they challenge a policy of Defendant in implementing its health insurance.").  Therefore, determining defensive preemption requires a broader evaluation than that suggested by the defendants.

In sum, ERISA fails to preempt the plaintiff's state law claims (as pleaded in the second amended complaint).  The plaintiff disavows an entitlement to benefits due under a federally governed plan and, instead, the plaintiff challenges (1) the defendants' underpayments under an agreed fee schedule, (2) the method by which the defendants underpaid, and (3) the defendants' performance of other contractual obligations unrelated to payment claims.  These challenges require consultation of the Provider Agreements, not an ERISA benefit plan.  Assuming the truth of the plaintiff's factual allegations and any direct and necessary inferences from the allegations, the plaintiff's claims seek no benefit due under an ERISA plan.  *Plastic Surgery Center*, 967 F.3d at 233 (finding that the motion to dismiss stage compels the inference that "the claims as pleaded are not for benefits due under the plans").  "[C]ourts generally find that preemption does not exist when a state law contract claim is based upon a relationship that does not involve the ERISA plan itself," *Med. Mut. of Ohio, v. Air Evac EMS, Inc.*, 341 F. Supp. 3d 771, 778 (N.D. Ohio 2018), and the plaintiff's challenges require none of the exacting, tedious, or duplicative inquiries into an ERISA plan that the preemption doctrine intends to bar.  *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 85 (3d Cir. 2012).

### B. Preemption under FEHBA and Medicare

Aside from ERISA preemption, the defendants argue that FEHBA and Medicare preempt the plaintiff's claims, and the defendants argue that the plaintiff failed to exhaust administrative remedies under FEHBA and Medicare.  With reasoning redolent of the plaintiff's ERISA-preemption arguments, the plaintiff contends that neither FEHBA nor Medicare preempts any of the claims because the plaintiff's claims arise under no federally governed health benefit plan.  Again, addressing FEHBA and Medicare, the plaintiff insists that the Provider Agreements' "no denial following authorization" provisions prohibit the defendants' raising coverage determinations as an exception to payment after authorization is granted. (Doc. 71 at 18)  And according to the plaintiff, because the federal statutory schemes remain inapplicable, the plaintiff bore no duty to exhaust an administrative remedy.

Preemption analysis under FEHBA is "similar to" preemption analysis under ERISA.  *Advanced Diabetes Treatment Centers of Fla., LLC v. Blue Cross & Blue Shield of Fla., Inc.*, 2010 WL 11591055, at *5 (S.D. Fla. 2010); *Negron v. Patel*, 6 F.Supp.2d 366, 371 (E.D. Pa. 1998) ("The preemption provision in ERISA, like that in the FEHBA, calls for an examination of how particular state laws 'relate to' the insurance plans that the statute regulates.").  Thus, "precedent interpreting the ERISA provision . . . provides authority for cases involving the FEHBA." *Botsford v. Blue Cross & Blue Shield of Montana, Inc.*, 314 F.3d 390, 394 (9th Cir. 2002).  The analysis above demonstrates that neither ERISA nor FEHBA "relate to" the

plaintiff's claims under the Provider Agreements.  Thus, although an ERISA or an FEHBA plaintiff typically must exhaust all available administrative remedies, *Perrino v. Southern Bell Tel. & Tel. Co.*, 209 F.3d 1309, 1315 (11th Cir. 2000), the plaintiff here bore no duty to exhaust an administrative remedy.

Preemption under Medicare presents a closer (and arguably distinct) question. The authorities disagree about the extent to which ERISA law and FEHBA law guide and influence interpretation of Medicare.  *Dunn v. Blue Cross Blue Shield of Alabama*, 2011 WL 13285142, at *11 n.8 (N.D. Ala. 2011) ("[C]ourts disagree whether Medicare cases are useful precedent" for the FEHBA context); *cf. New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 667 (1995) (analogizing ERISA to Medicare in discussing congressional intent and preemption), *and Weinberger v. Aetna Health, Inc.*, 2008 WL 11333422, at *14 (S.D. Fla. 2008), *report and recommendation adopted*, 2008 WL 11333408 (S.D. Fla. 2008) (finding the preemption analysis under FEHBA and Medicare "to be conceptually indistinguishable" from the preemption analysis under ERISA),[3] *with Morrison v. Health Plan of Nev.*, 328 P.3d 1165, 1171 (2014) ("ERISA and Medicare are fundamentally different programs and cannot be analyzed in the same way."), *and Orthopedic Specialists of New Jersey PA v. Horizon Blue Cross/Blue Shield of New Jersey*,

---

[3] Although *Weinberger v. Aetna Health, Inc.*, 2008 WL 11333422 (S.D. Fla. 2008), addresses complete preemption, the principle applies with equal weight because determining complete preemption is a narrower inquiry than determining defensive preemption, and each "can inform the other's analysis." *Surgery Ctr. of Viera, LLC v. Cigna Health*, 2020 WL 4227428, at *3 (M.D. Fla. 2020).

518 F. Supp. 2d 128, 138 n.8 (D.N.J. 2007) ("[T]he Court finds Medicare case law

inapposite to the FEHBA context.").  Further, the parties cite only scant governing

precedent (because only scant governing precedent is available) to support the

argument about administrative exhaustion under Medicare.

Despite the dearth of precedent on the issue, decisions from other circuit

courts of appeals and other district courts provide insight into preemption and

administrative exhaustion under Medicare.  A plaintiff that seeks to recover on any

claim "arising under" Medicare must travel through the "narrow channel" of an

HHS administrative appeal before asserting the claim in federal court.[4]  *Lifestar*

*Ambulance Serv., Inc. v. HHS*, 365 F.3d 1293, 1296 (11th Cir. 2004); *Tenet Healthsystem*

*GB, Inc. v. Care Improvement Plus S. Cent. Ins. Co.*, 875 F.3d 584, 587 (11th Cir. 2017).

A state law claim "aris[es] under" Medicare "if (1) the standing and substantive basis

for presentation of the claim are Medicare, or (2) a claim is inextricably intertwined

with a claim for reimbursement of medical benefits."  *Assocs. Rehab. Recovery, Inc. v.*

*Humana Med. Plan, Inc.*, 76 F. Supp. 3d 1388, 1392 (S.D. Fla. 2014) (*citing Heckler v.*

*Ringer*, 466 U.S. 602, 606 (1984).

---

[4] Applied to Medicare by 42 U.S.C. § 1395ii, 42 U.S.C. § 405(h) explains that 42 U.S.C. § 405(g) offers "the sole avenue for judicial review" of a claim "'arising under' the Medicare Act." *Heckler v. Ringer*, 466 U.S. 602, 614–15 (1984). Under 42 C.F.R. § 422, after a Medicare Advantage organization furnishes an "organization determination" about payment, any party to the determination (including a provider) can request re-consideration. After re-consideration, the party requesting re-consideration can request a hearing before an administrative law judge. 42 C.F.R. § 422.600. After the administrative law judge reviews the "organization determination," the party can request a review before the Medicare Appeals Council. 42 C.F.R. § 422.608. Only after a final decision by the Medicare Appeals Council can a party seek judicial review.

In *RenCare, Ltd. v. Humana Health Plan of Tex., Inc.*, a provider sued a Medicare Advantage organization for reimbursement of services provided to the Medicare Advantage organization's members under a provider agreement.  395 F.3d 555 (5th Cir. 2004).  *RenCare* holds that the provider's claims for breach of contract and for violation of state law (among other claims) are not "inextricably intertwined with a claim for Medicare benefits."  *RenCare*, 395 F.3d at 560.  *RenCare* reasons that the "dispute is solely between [the insurer] and [provider] and is based on the parties' privately-agreed-to payment plan."  395 F.3d at 558.  And for the claim in *RenCare*, unlike claims in other cases, "no enrollees seeking Medicare benefits" initiated the action.  *RenCare*, 395 F.3d at 558.  Accordingly, *RenCare* holds that "there are no administrative remedies for [the provider] to exhaust . . . because [the provider's] claims do not arise under the Medicare Act."  *RenCare*, 395 F.3d at 560.

*Associates Rehab. Recovery, Inc. v. Humana Med. Plan, Inc.*, 76 F. Supp. 3d 1388 (S.D. Fla. 2014), declines to follow *RenCare*, and the defendants heavily rely on *Associates Rehabilitation* to support dismissing the plaintiff's claim.  In *Associates Rehabilitation*, a rehabilitation service provider sued an insurer operating a Medicare Advantage program after the insurer denied payment for services deemed "medically unnecessary."  *Associates Rehabilitation* distinguishes *RenCare* because "the Fifth Circuit rationale in *RenCare* relied on the regulatory system in effect at that time, which was subsequently replaced with a new framework which changed the way that MA organizations are paid."  *Associates Rehabilitation*, 76 F. Supp. 3d at 1392.

Accordingly, *Associates Rehabilitation* holds that "only after Plaintiff has exhausted the administrative process may Plaintiff file a civil action in a federal district court." 76 F. Supp. 3d at 1393.

Although persuasive, the reasoning in *Associates Rehabilitation* is not decisive. *Associates Rehabilitation* addresses different issues, and after *Associates Rehabilitation*, the Eleventh Circuit addressed — albeit in a slightly different context — a provider's duty to exhaust administrative remedies under Medicare.  In particular, *Tenet Healthsystem GB, Inc. v. Care Improvement Plus S. Cent. Ins. Co.*, 875 F.3d 584 (11th Cir. 2017), addresses whether a hospital challenging an insurer's payment decision is a party to an "organization determination" and, consequently, subject to Medicare's administrative exhaustion requirements.

Distinguishing *RenCare*, *Tenet Healthsystem* observes that "*RenCare* addressed claims brought by contract providers against [a Medicare Advantage organization] for breach of the express provisions of a written contract."  875 F.3d at 591.  By contrast, the hospitals in *Tenet Healthsystem* comprised "noncontract providers," which "cannot charge more than Medicare reimbursement rates, and thus may not assert higher independently contracted rates."  *Tenet Healthsystem*, 875 F.3d at 590. As non-contract providers, "the only viable claim the Hospitals can pursue is their right to recover the same reimbursements that the enrollees were entitled to receive under the Medicare Act, and that claim is subject to the Act's administrative

exhaustion requirement." *Tenet Healthsystem*, 875 F.3d at 590. "But," *Tenet Healthsystem* emphasizes:

> the distinction between contract providers and noncontract providers is critical. In billing disputes between MAOs and contract providers, the provider is pursuing a claim for reimbursement that only ever belonged to itself—the claim that arose under the express terms of its contract with the MAO. *Tenet Healthsystem*, 875 F.3d at 590.

However, in billing disputes with a non-contract provider, the claim "arises under" Medicare.

Further, *Tenet Healthsystem* discusses amicus briefs by the United States Department of Health and Human Services in actions addressing similar claims. In those briefs, the "HHS unequivocally expresses its belief [1] that third-party contract providers (rather than noncontract providers . . .) are not assignees" within the definition of Medicare's administrative exhaustion provisions and (2) that "extending an administrative exhaustion requirement to payment disputes purely between [a Medicare Advantage organization] and a provider would improperly tax, and potentially overwhelm, CMS's limited resources." *Tenet Healthsystem*, 875 F.3d at 590–91.

Although an extensive treatment of administrative exhaustion under Medicare is unnecessary, several other circuit courts of appeals confirm the reasoning in *Tenet Healthsystem* and *RenCare*. That is, other case law (both inside and outside the Eleventh Circuit) is at least in tension with, if not contrary to, *Associates Rehabilitation* (a decision that is non-binding at any rate). Contrary to *Associates Rehabilitation*'s

treatment of the issue, these courts — evaluating administrative exhaustion —

ascribe weight to a provider's status as a contracting or non-contracting party.  *See,*

*e.g.*, *New York City Health & Hosps. Corp. v. WellCare of New York, Inc.*, 769 F. Supp. 2d

250, 258 (S.D.N.Y. 2011) ("The *RenCare* court emphasized that contracts between

[Medicare Advantage] Organizations and Contracted Providers are subject to very

few restrictions. . . .  By contrast, the parties here had no contractual relationship and

reimbursement is governed by a complex federal regulatory scheme."); *Doctors Med.*

*Ctr. of Modesto, Inc. v. Kaiser Found. Health Plan, Inc.*, 989 F. Supp. 2d 1009, 1014–15

(E.D. Cal. 2013) ("[T]he Hospital does not allege that it had an express written

contract. . . .  [T]he dispute over Kaiser's payment obligation turns on the standards

provided by the Medicare Act and CMS regulations for paying non-contracted

emergency providers.").[5]  The defendants overlook this precedent and rely too

heavily on *Associates Rehabilitation*.  But the plaintiff's status as a contracted provider

gravitates against the conclusion that this action "arises under" Medicare.

In this action, the plaintiff sues the defendants for breach of the Provider

Agreements.  Thus, "[a]t its core, [the plaintiff's] claim arises from a private billing

dispute. . .  [and a]ny dispute over payment is solely between [the plaintiff] and [the

---

[5] Similarly, *Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.*, 647 F. App'x 619, 625 (6th Cir. 2016), addresses removal under the federal officer statute, which is a distinct issue. The opinion also addresses the exhaustion of administrative remedies. The opinion observes that the defendant's "argument is dubious. At its core, [the plaintiff's] claim arises from a private billing dispute. No beneficiary was denied Medicare benefits. . . . Any dispute over payment is solely between [the plaintiff] and [the defendant]." *Ohio State Chiropractic*, 647 F. App'x at 625.

defendants]." *Ohio State Chiropractic*, 647 F. App'x at 625.  As a "contracted party," the plaintiff retained no duty to exhaust an administrative remedy under Medicare. *RenCare, Ltd. v. Humana Health Plan of Texas, Inc.*, 395 F.3d 555, 559 (5th Cir. 2004) ("At bottom, RenCare's claims are claims for payment pursuant to a contract between private parties.").[6]

Further, policy considerations and "the purpose of Congress" commend against an action's "arising under" Medicare if the plaintiff is a contracted provider. As the Centers for Medicare and Medicaid Services (CMS) explained in response to a payment dispute between a contracted provider and a Medicare Advantage organization:

> [Medicare Advantage] regulations clearly limit [CMS]'s ability to intervene in payment disputes between [Medicare Advantage] organizations and their contracted [Medicare Advantage] providers. [T]he existence of provider contracts that can be enforced by the courts is why the Congress limited [CMS]'s regulatory authority in comparison to those afforded non-contracted providers.

*Christus Health Gulf Coast v. Aetna, Inc.*, 237 S.W.3d 338, 340–41 (Tex. 2007) (*quoting* Letter from Acting Director of the CMS Medicare Managed Care Group (Mar. 30,

---

[6] Also, the defendants in this action advance no argument that the plaintiff is an "assignee" within the definition of Medicare's administrative review regulations, 42 C.F.R. § 422, nor could they. The governing precedent (and more persuasive non-governing precedent) suggests otherwise, and the plaintiff expressly disavows asserting a claim under an assignment of benefits. *See* (Doc. 64 at 4)

2001)).[7]  Congress's purpose in creating Medicare Advantage "was to harness the power of private sector competition to stimulate experimentation and innovation that would ultimately create a more efficient and less expensive Medicare system." *Humana Med. Plan, Inc. v. W. Heritage Ins. Co.*, 832 F.3d 1229, 1235 (11th Cir. 2016) (*quoting In re Avandia*, 685 F.3d at 363).  Enforceable, predictable contracts between providers and Medicare Advantage organizations foster that purpose.  Requiring administrative exhaustion from a provider asserting a claim under a provider agreement is a "far cry" from that purpose.

In sum, the plaintiff's claims neither contain an impermissible "relation to" a federal statute nor "arise under" a federal statute.  The claims neither "interfere with national uniform plan administration" nor undermine Congress's purpose in enacting the statutes.  Neither Medicare nor FEHBA nor ERISA preempts the plaintiff's breach of contract claims and, consequently, the hospital bore no duty to exhaust an administrative remedy.

### III. *The plaintiff's claims under Florida Statutes*

Finally, the defendants argue that the plaintiff fails to state a claim under Section 641.513, Florida Statutes, and Section 627.64194, Florida Statutes.  The defendants reason that Section 641.513, Florida Statutes, "does not apply to Florida

---

[7] *See also* Stephen M. Elwell, *Preemption of Contract Claims by the Medicare Act: An Analysis of the Recent Holding in Lifecare Hospitals v. Ochsner Health Plan*, 24 REV. LITIG. 125, 144 (2005) ("[T]he Medicare Act and its accompanying regulations currently do not provide a procedure for resolving contract disputes between health care providers and HMOs, and the Act and regulations were not drafted with the intent to govern such disputes.").

Blue" because Florida Blue "is not a health maintenance organization." (Doc. 68 at 23)  The plaintiff responds (1) that the statutes "provide a duty independent of ERISA"[8] and (2) that "BCBSF is subject to the formula set forth in Section 641.513." (Doc. 71 at 21)  Although neither party cites persuasive authority on the plaintiff's ability to assert a claim against Florida Blue (because Florida Blue enjoys no status as an HMO), a review of Section 641.513 confirms that the section applies to a "health maintenance organization" only, but not to an insurance company. However, Section 641.513's limited application does not end the matter.

The distinction between an HMO and a health insurance company "is not without a difference." *Cousins v. United Healthcare, Inc.*, 2020 WL 1666628, at *3 (S.D. Fla. 2020).  And the defendants correctly observe that the hospital cannot sustain a claim against Florida Blue under Section 641.513, Florida Statutes. However, the defendants overlook the fact that Section 627.64194, Florida Statutes, incorporates by reference Section 641.513(5).  The second amended complaint cites Section 627.64194 to support the plaintiff's statutory claim and notes that "BCBSF breached its obligations under law, including, *without limitation*, Section 641.513." (Doc. 64 at 22)  Further, the defendants acknowledge that the plaintiff attempts to state "claims under 627.64194." (Doc. 68 at 26)  Therefore, read in context, a reasonable construction of Count II states a claim against Florida Blue.

------

[8] The plaintiff's point pertains to a jurisdictional analysis under Section 502(a). But as stated in the April 7, 2020 order, complete preemption under Section 502(a) "provides a basis for removal jurisdiction, . . . [and] must be addressed first." (Doc. 61 at 7)

Next, the defendants argue that the plaintiff fails to state a claim under Section 627.64194, Florida Statutes, because the plaintiff fails to "plead facts that plausibly meet the statutory definition" of each element of the statutory claim.  (Doc. 68 at 24)  Specifically, the defendants argue that the second amended complaint lacks allegations that a patient presented "with 'acute symptoms,' that those symptoms were of 'sufficient severity,' that they put 'the health of the patient' in 'jeopardy,' or required 'immediate medical attention,' or even that 'medical screening' of the type contemplated by these statutes was provided."  (Doc. 68 at 26)  The plaintiff responds that the "Hospital has sufficiently pled allegations that meet the statutory definitions . . . [because] Hospital's Second Amended Complaint uses the same terms that appear in Florida Statute Section 641.64194 — 'emergency services' and 'nonemergency services.'"  (Doc. 71 at 21)

Section 627.64194, Florida Statutes, outlines an insurer's reimbursement obligations to a "nonparticipating provider" for "covered emergency services" and "covered nonemergency services."  Although adducing only a few facts to support violations of Section 627.64194, Count II supports the alleged statutory violations by incorporating examples "set forth in paragraphs 69 through 70 above."

Although appearing in Count I, paragraph 70 states that a patient "presented to the Hospital's emergency department . . . [and] was treated in both the emergency department and the inpatient setting . . . to relieve or eliminate the member's emergency medical condition."  And the plaintiff alleges enough facts to support

that the plaintiff qualifies as a "facility that has a contract for the nonemergency services." Thus, the language in the amended complaint sufficiently (even if minimally) places the defendants on "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The plaintiff states a claim under Section 627.64194, Florida Statutes.

## CONCLUSION

The parties' dispute centers around the parties' privately formed agreement. Coverage is ancillary, at most. As a contracted provider, the plaintiff states claims that — as confirmed by the plaintiff's explanation — elude ERISA preemption. The second amended complaint includes enough facts to satisfy the pleading standard of *Twombly*. The defendants' motion (Doc. 68) to dismiss is **DENIED**.

ORDERED in Tampa, Florida, on January 5, 2021.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE